The next case for argument is 22-2207, Intellectual Tech v. Zebra Technologies. Mr. Perkins, whenever you're ready. Good morning, Your Honors. May it please the Court, James Perkins on behalf of the appellant, Intellectual Tech. This case is an outstanding, and it largely picks up where the Court left off in a trio of unilaw cases a couple years ago, because the lower court based its ruling on the same district court decision in that case. So first, Intellectual Tech, as the owner of the 247 patent, has Article III standing to sue Zebra. To the best of our knowledge, this Court has never held otherwise. And the only issue here is Article III standing. We are assuming for purposes here that there is what sometimes is still called, but less often happily, statutory standing. That is, we're assuming the existence of the cause of action under 281 to Intellectual Tech. I think that's right, Your Honor. So below, Zebra raised prudential or statutory standing as well. The Court decided the case solely on constitutional standing and didn't get to prudential standing. So I think for today we can assume that we have prudential standing, or that that's just maybe left for another day depending on the outcome of this Article III standing. Well, there's another case pending, right? You refiled? Or is there something else? Yeah, so there is another case that's currently stayed. Following the Court's order that we're here on appeal, we entered into a clarification of rights agreement between Main Street and Intellectual Tech to say that the parties didn't think the Court's order was correct, explain their rights vis-à-vis the agreements. Then the Court issued their unilog decision. Obviously, with the collateral estoppel, there were some concerns. And so that case has been stayed pending appeal in this case. Do we agree with you on the power of attorney clause issue? Do we even need to reach the unilog questions? I don't think so. I think there's a couple ways to resolve this. I think, first, the fact that Intellectual Tech is the owner of the patent gives them Article III standing, which is what I began with. No court's ever said otherwise. I think everyone agrees here, at least. The District Court said at page 21 of the appendix, and this was in denying the reconsideration, but just affirming that, the title to the 247 patent remained with Intellectual Tech. And so as this Court said in Intellectual Property Development 248 F. 3rd at 1345, title in the patent, quote, confers constitutional standing on the assignee to sue another for patent infringement in his own name. Similarly, in Pandrel 320 F. 3rd at 1368, the Court said, quote, establishing ownership of a patent that has been infringed satisfies the requirement of Article III standing. The Court said the same in Schindelman, which is discussed in our briefing as well. So I don't even know if you have to get to the issue on the attorney in fact to find Article III standing, but we certainly think that would support it as well. I guess what I was thinking about it is that we do have to get to it, and it turns on the question whether if I make you my attorney in fact, that does authorize you to do things. Maybe in my interest, maybe not, but it certainly authorizes you to do things. In my understanding, and this is my question, under Texas law, it doesn't deprive me of the right to do them myself, does it? If it does, then I think you have a serious problem. No, and I think that's the case we point out. It doesn't give you substantive rights like an assignment would. So it just allows Main Street to kind of step into the shoes of really not even intellectual tech, but Adam Kroszner, the sole member of intellectual tech. Let me see if I at least have a clear idea of what I'm trying to ask, and I just want to make sure that either I've not communicated it or that I'm wrong about it. If I make you my attorney in fact irrevocably, that gives you certain powers as an attorney in fact to take certain action. My understanding is that my giving you that authority does not deprive me of the right to take those same actions unless you sort of step in the way and prevent me from doing it. That's correct, Your Honor. Okay. And I think that's supported by Section 6, I believe that's page 233 of the appendix, I believe. And Section 6 lays out the remedies that Main Street could have in default, but it says while default exists, Main Street may add its option. And so I think that clarifies what you're saying is the parties agreed that in the event of default, Main Street could foreclose, which no one's really contesting here, or they could take action as attorney in fact, but they have the option also to do nothing and to allow intellectual tech continue to prosecute the case as far as this patent and any other intellectual property. And so we do kind of disagree with the court's interpretation of the agreements, but I think even if you take the court and say it was correct at Appendix 13 that Main Street possessed an unfettered right to license the 247 patent, that still doesn't mean that intellectual tech lost constitutional standing. And the court, we know, reiterated that in the Unilog decision, which it didn't ultimately reach the conclusion, but it did say that its prior rulings and aspects in Alfred E. Mann, quote, held that the patentee's grant of a license that includes the right to sublicense did not deprive the patent owner of Article III standing. So we think even if the court's somehow correct about these agreements, the fact that in Zebra's opinion and the court's opinion that Main Street had this unfettered right, that that doesn't mean that intellectual tech lost standing. What about our opinion in YF? I'm sorry, Your Honor? What about our court's opinion in YF? It was cited in the briefs, I think, and I think the district court may have cited it too. I'd have to check. It was about an exclusive licensee. Oh, YF, I'm sorry. I thought you said YF. Oh, sorry. Yes, Your Honor, so I do think that's, I think Judge Lurie in his separate writing in the Unilog case explained why YF was about exclusive licensees and why Unilog, the district court in Unilog, which has applied the same understanding as the district court here, was wrong in extending YF, an exclusive licensee, to a patent owner. But why? I mean, the logic of YAV doesn't really seem like it needs to be confined to exclusive licensees. If somebody has the potential to obtain a license, at least under YAV, why does it matter that they could obtain a license from the exclusive licensee, the patent holder, or somebody else? If somebody here can obtain a license, wouldn't the logic of YAV lead to a finding of no standing? I don't think so here, especially because Zebra could not obtain a license from Main Street. I mean, that's the whole point of this power of attorney provision is Main Street could grant a license, but it had to do so in the name of and on behalf of Intellectual Tech. So the license would be from Intellectual Tech, not from Main Street. Assume the opposite of that. Assume that the authority to sell or assign incorporates an authority to grant somebody else a license. Still the same answer? It's still the same because here, and I think that was the district court's, really his order was this unfettered right, but if you look at footnote four, he goes on to talk about this right to assign. The problem here is, as the court reiterated, and as everyone seems to agree, is Intellectual Tech had title to the patent, so Main Street could not assign the patent as Main Street. So you still get back to the fact the only way Main Street can act to do these things is to foreclose, take the asset and do what they want with it, or use this attorney in fact to slide in, and really in the place of Adam Kroszner, the member of Intellectual Tech, to do these things in the name of and on behalf of Intellectual Tech. So the answer is really the same. The assignment would still be, the assignment agreement would have to be signed. Whoever signs it, whether it's Main Street or their delegate, it would still be Intellectual Tech assigning the patent or granting the license. So I think that largely distinguishes the case from the Fortress case and the Unilock decision, but I think it's also why it wouldn't apply either, because ultimately they can't get an assignment, a license, anything from Main Street. It all would be coming from Intellectual Tech, even if technically Main Street or their delegate. That may be right or wrong, but I think maybe the answer to Judge, one of the part answer to Judge Hughes' question, which I appreciate because I had similar questions, lies in Judge Lurie's dissent, concurrence most specifically, where he does differentiate between the rights of an exclusive licensee and a patent owner, pointing out that the patent owner is different. The patent owner still retains the right to sue unlicensed licensees, whereas the licensee does not. I don't know that the court's ever said that officially, but he made that distinction in his concurrence. Yeah, I think that is consistent with the cases I read initially about all you need is, and I think it's Schwindeman that said this, is that you're the owner of the patent and that the defendant is accused of infringement. That's all you need for standing. And I think it's also consistent with the way that it was discussed in Morrow. Morrow said there's basically three types of plaintiffs. One, the patentee, who has the right to sue in their own name. Two, the exclusive licensee, which may or may not need to add the patentee, and I think that maybe, Judge Prost, getting to your question, your question, Judge Hughes, is, and I think this was discussed in some of the, maybe even one of your questions in the Unilock oral argument, is at some point maybe the patentee can give away so many rights to the exclusive licensee that they're no longer, they're a nominal owner, right? And so I think that can apply in the exclusive licensee context, but that's not what we have here. We don't have an exclusive license. And it really wouldn't make sense to have an exclusive license in this case because Main Street, they're an investment bank. They're not the typical exclusive licensee that gets the rights. They want to exploit the patent and make a product and keep people out of their market. That's not really here, so it doesn't apply on the face of these agreements. It also really wouldn't make practical sense here to consider Main Street. Main Street would not want to be an exclusive licensee. I see I'm into my rebuttal time. Yes, why don't we hear from the other side? Thank you. Thank you. May it please the Court. William Peterson on behalf of Zebra Technologies Corporation. I'm happy to defend the district court's analysis, but I would like to start with talking about what we argued below. My friend suggests that we didn't make the argument that Main Street was the sole possessor of these rights following the default. I'll point you to appendix page 309 to 310. That's the summary judgment motion in question. And what you'll see there is that we were arguing that Main Street was the possessor of all substantial rights following the default. And you see this on appendix page 316, that we believe that on-assets rights were divested upon default and that those rights were transferred from on-asset to Main Street, leaving essentially nothing for on-asset to give to IT. So that was our principal argument in front of the district court, was not that there are no plaintiffs, but that at the time this case was filed, that Main Street was the correct plaintiff. Now, we're not suggesting, Judge Stronto, that it was the power of attorney provision in Section 3J that accomplished this. What we're suggesting is two things. First, it's the most natural reading of the transfer of rights within Section 6, in part because of just how counterintuitive it would be to give 100% of the patent rights, both pertaining by the party with title to it and to the creditor as well. Extraordinarily unusual. When you look at cases where, say, for example, the right to sue is divided up, and I'm thinking of Alfred E. Mann, you see agreements talking about how the parties will interact, who will make the decisions. It's an unnatural reading to suggest that all of these rights would be completely possessed at the same time by two parties, which is why this ends up, in many ways, being almost something of an academic exercise. Why, for Article 3 purposes, is the issue properly framed as all of the rights in one place or the other? What's happening here is a lender has a security interest, which at its option it can exercise until it exercises it. The borrower, the title holder of the patent, clearly has an Article 3 stake, has an ability, as long as it's left uninterrupted by the lender, to go and sue. The parties certainly could have written their agreements that way. That's not how we understand their agreements to have been written. It would have been very straightforward for Main Street and On Asset to say that Main Street is simply allowed to foreclose on the collateral as soon as there's a default. It has no rights to enforce anything. It has no rights to license anything. Those rights remain with On Asset until Main Street takes control of it and forecloses on it. For whatever reason, that's not the agreement that On Asset and Main Street drafted. As soon as there was a default, it was Main Street that had the right to exercise any or all remedies to sell, assign, transfer, pledge, encumber, or dispose of the patents. Keep in mind, patents here doesn't just mean the 247 patent. Patents is defined broadly to include the right to sue for infringement, to include licenses under those patents, to include any sort of interest under there. The other provision I'd point you to, this is appendix page 232, and that's the debtor's use of the patents and trademarks. That to us is really one of the strongest clauses here, that the debtor that is On Asset shall be permitted to control and manage the patents and trademarks, including the right to exclude others. That last clause in there says, so long as no default exists. I think my friend wants to say, regardless of whether any default exists, when we look at this agreement, when there's a default, for whatever reason, whyever the parties chose to draft it this way, as soon as that default happened, Main Street immediately, and without taking any other action, had all sorts of rights to enforce these patents. I guess what I'm not clear about is, it does seem to me that on the face of the thing, Main Street had a right, if it wished, to step in and do all of these things that would destroy any ability of intellectual tech to exclude. But as long as it doesn't do that, why does intellectual tech not have a cognizable, legally and factually cognizable interest in proceeding? And in this instance, presumably, actually, it's pretty darn unlikely Main Street's going to step in. What Main Street wants is for this patent to be monetized so it can get its money back. The parties agree that Main Street has the right, under these agreements, to foreclose on the 247 patent and to take title to it, and that Main Street didn't exercise that right. And if that were the only right that Main Street had under these agreements, I would absolutely agree with you, Judge Toronto. It's this additional grant of rights in Section 6 that, in our view, Main Street exercises without any need to foreclose on the patent, and that's why you see the power of attorney in Section 3J that allows Main Street, without consulting with IT or on asset, without any control by them, to take these actions. And we've talked about... I guess I'm really unclear what you're saying. I mean, how is what you're saying different than what Judge Toronto said? Under Section 6, it says, while a default exists, they may, at their option, take any of the following actions, none of which they've done. So how is that different than the situation that Judge Toronto posed to you? So I think what I would suggest is there's a... So a patentee, for example, if I go and acquire a patent and have my patent application granted, I, at that point, have... I may, at that option, sell that patent that I have. I may, at that option, license that patent that I have. I may, at that option, enforce or otherwise dispose of it. That's the sort of rights that a traditional patentee has. There's no mandatory obligation on that. I, as a patentee, don't have to sell, don't have to enforce it, don't have to assign it. So what we see Main Street acquiring in Section 6 is just the traditional rights that any owner of a patent ordinarily has. Not this right to foreclose and then subsequently have the right to license, but the right, just like anyone else ordinarily would have with a patent that they own. But let me step aside. That's our primary reading of the contract. Can I ask you... Yes. Hypothetically, let's say you have a patentee that has all substantial rights and would have constitutional standing to enforce the patent, but it also grants an exclusive license to another entity to enforce it in, say, one part of the country or some kind of thing. Does that deprive the original patentee of its ability to enforce a patent in its standing? Let me make it clear. That part of the country thing muddies it up. If a patent owner grants an exclusive license to a licensee that is sufficient for that exclusive licensee to itself have standing to assert patent infringement claims, does that deprive the original patent owner of standing to also assert patent infringement claims? Judge Hughes, in your hypothetical, has the exclusive licensee received all substantial rights? That's the question. Is giving an exclusive licensee sufficient rights to assert patent infringement, so standing, so I guess, yes, substantial rights, does that necessarily deprive the patent owner? When we're talking about the assignment context, this court has sometimes talked about the first... I'm not talking about an assignment. I'm talking about exclusive license. Well, certainly. But they're different. Except I think what the court has said is that an exclusive license... I don't know what the court has said. I don't understand half of these cases because I think our case law is very muddled and I'm trying to figure out what it means. I think that's right, Your Honors. I look at the cases and I see a transfer of all substantial rights means that the party who has received the substantial rights is going to have both the right to sue under Section 281 and is going to have standing for purposes of Article III. Now, when you're dealing with... Sure, but does that mean the patentee, without saying it is transferring some other sufficient clause, does that mean the patentee can't go out and file a patent infringement suit? Yes, Your Honor. My understanding is that it does. When you look at the facts that constitute a transfer of all substantial rights, what we're really talking about is a transfer of not just the exclusionary rights, which are enough to give an exclusive licensee standing to sue, but you're also talking about a transfer of even more, those exclusionary rights, plus sufficient for purposes of Section 281 to constitute a de facto assignment of the patent. Let me talk about exclusionary rights, though, because I do think Y.A.V. or the case that, as we see it, depends... So your view is that Clause 6 is doing that? Yes, Clause 6 combined with Clause 4. Our suggestion is that it's not a rational reading to say that these rights belong 100% both to Main Street and to On Asset at the same time, and that, again, the parties could have written this just to say, once there's a default, Main Street may at its option foreclose. The parties didn't say that. They said, once there's a default, Main Street may at its option just independently go forth and take all these options, take all of these actions with respect to the patents. That to us implicitly means, when you look at Section 4 there, that I.T. couldn't, which means that Main Street... In other words, the default automatically transferred all substantial rights. That was our argument below, and that certainly remains what we think is a basis to affirm this. If Clause 6 weren't in there, you wouldn't have that argument, right? I wouldn't be making this argument. Let me turn, though, to the District Court's analysis. So let's assume we have completely shared rights here. We do think the case that defines substantial rights... I'm sorry, the case that defines exclusionary rights is Y.A.V., and it looked at exclusionary rights, admittedly in the context of exclusive licensees, but it tells us that an exclusionary right, an exclusive licensee lacks standing to sue a party who has the ability to obtain a license from another party with the right to grant it, and that is because the exclusive licensee does not have an exclusionary right with respect to such an alleged infringer and therefore is not injured by that alleged infringer. So unless the same term, exclusionary rights, means something different for exclusive licensees... I find that language kind of troubling and read as broadly as you to be just legally unsound. I mean, if a patent owner sues somebody, that somebody could always try to get a license from that patent owner. That doesn't deprive the patent owner of standing to it. So it can't be the mere fact that you can get a license from somebody deprives the person that owns the patent or has exclusionary rights to assert the patent, that that destroys standing. You're not reading it that broadly, are you? No, it's from another party, so a party other than the plaintiff. So that would be the suggestion, that if you are... When the plaintiff in a lawsuit sues an alleged infringer and that alleged infringer has the ability to obtain a license from someone other than the plaintiff in the lawsuit, that plaintiff doesn't have an exclusionary right. So if the patent owner gives a license... If I'm a patent owner, I give a license to you. You're not exclusive, but you're allowed to sub-license. So have I just lost my ability to sue your friend over there because you could grant him a license even though you have it? Yes, Your Honor, with certain caveats. Now that assumes it is a completely unfettered right to sub-license. I don't understand why we're talking about any of this, honestly. The fact that you can get a license should just mean that you can get a license and then you can assert it as a defense to patent infringement. How this all got mixed up in Article 3 standing baffles me. I mean, it seems like it got mixed up because we were trying to define what exclusive license these are and it is bled into the rights of patent owners. And if somebody owns a patent, they should be allowed to sue somebody on that patent unless they have somehow clearly given all those rights away. So I understand the intuition Judge Hughes, but all I can do is say that intellectual property rights are to some degree special. That the right that is in a patent is the right to exclude others from practicing that patent. And Judge Toronto, if I were to grant you a license to a patent that I own and say you may license this patent to whomever you please, you don't have to tell me, you don't have to pay me, you don't have to compensate me, what I am doing is essentially saying I am indifferent to who practices this patent because I am letting you decide who gets to practice it. I am giving up my ability to control. This is, again, a bit counterintuitive. The closest analogy we have been able to find is in the trademark context where you have a naked license to a trademark. Even in that circumstance, I am not sure who the licensee is, whether it is you or me in this situation. I think I would be giving you a license. Okay, we switched it up. So you still have a monetizable interest in giving somebody a license that might have asked me for a license and I have said no because you are not going to pay me enough and you can say, oh, I will give a license because I will take half of that. That is an interest, right? And why is that not enough for Article 3 to say you can exclude that person and it is a valuable right to exclude them because they might be willing to pay you. And the fact is in most of those cases, we simply don't know whether you would have offered those licenses, whether you would have refused them. Perhaps it is a situation that needs to be cured by the joinder of both of us, of both of us suing together as plaintiffs. Right, but questions of joinder, questions of 281, cause of action, whatever you want to call it, prudential standing, statutory standing, I thought we were kind of more or less beyond that because it is so confusing. But just Article 3 standing, those other questions are about other things. Let me try the redressability point. And I nodded to it in the brief. Patent damages are compensatory. They are not punitive. These are not liquidated damages. Even the reasonable royalty rate is intended to compensate the plaintiff for the royalty that would have been negotiated had there not been infringement. And I think the problem that arises when you have another party out there that could grant a license is you are simply not able to show as a party who is filing. I don't understand this argument at all. The fact that somebody else could grant a license that would give you a defense doesn't mean at the time the suit was filed against you if you don't have a license that they're not suffering damages by your alleged infringement. If you want to run and get a license and you can get it from somebody, you can assert it as a defense. And that will be to the cause of action. But the patent owner is still damaged by you infringing it without a license. I think we see it differently in YAB, Your Honor. Well, I know. I mean, YAB is very, very confusing and troubling. And the easy way to deal with it is to say this is dealing with exclusive licensees. It's not dealing with patent owners itself where the rights are much clearer and say that this is the patent owner. It hasn't given away an exclusive license. It's entered into some kind of debt agreement that involves a default. And that until the bank asserts those rights or grants a license to somebody, they still have the right to sue. Your Honor, and I think the difficulty there would be defining... Isn't that what we essentially... I know that in Unilock, we went off on collateral estoppel because we had to. But I think we very heavily suggested that that's the argument or that's the view of what that panel was, was the right interpretation in limiting YAB to the exclusive licensee situation. I think that's the suggestion there, but I'll just say, and I realize I'm over time and I appreciate the panel's indulgence, that YAB is about defining the term exclusionary rights. It gives us a clear definition which says that they don't exist where there's a right to obtain a license from another party who's not the plaintiff. And I do think it would be an elevation of form over substance to say that the phrase exclusionary rights, the touchstone of constitution... So you think we need to go en banc if we're going to overturn YAB? Not overturn YAB, but limit it to? I think it would be necessary and I think it would probably require some different reasoning on that point as well, just because YAB says... I think we've made our reasoning very clear. I mean, I didn't sign on to Judge Lurie's concurring views, but he's laid out the reasoning on that point fairly clearly, I think. Certainly. I'll also offer the easiest way of affirmance would be to agree with us on the meaning of the contracts and not to have to address the harder issue. But thank you. Thank you. So I do want to briefly just defend the way this agreement is structured, because I think it actually makes sense in context and we know this agreement is governed by Texas law and the Texas Supreme Court said in Lenape 925 Southwest 2D at 574, quote, that courts should construe a contract from a utilitarian standpoint, bearing in mind the particular business activity sought to be served. I think if you see it in this agreement, what Main Street's doing, they're an investment bank, right? They make a loan. They want to recover their loan and they secure that loan by some assets, in this case, patents and trademarks. And what they say is, they know, if you're in default, I can foreclose. I can take the assets and I can do with them what I want to do. But they're also a bank. That's not their main job, is not monetizing and enforcing patents. And so they also say, we have these remedies and the way we can enforce those is through this power of attorney. It would make sense in this context. Honest, that's a small company. I think they have 12 to 14 employees. Obviously, if they went out of business and they're wholly unsubsidiary, they're just left to the wayside. But Main Street has the ability to step into that as managing the LLC. What do you think of the argument about Clause 6, though, which does seem to fairly track the types of language you would use to get an exclusive license? Well, I think there are a few things that are missing. And I think Judge Albright actually noted that. I mean, the first answer is, obviously, they're not an exclusive licensee. Oh, yes, they are not an exclusive licensee. They're a debt holder. Right. Whatever banking term. I can't keep patent and banking terms in my head at the same time. So that's the first answer. But assume that they could still be considered an exclusive licensee if the right language is given. Why isn't that what Clause 6 does? I think in part, as Judge Albright recognized, it doesn't actually give the right to license in Section 6. And I think we find some cases in our brief that you need to read this agreement as a whole. And what it does in Section 3 says, specifically, to facilitate Main Street's taking action under Subsection I and exercising its rights under Section 6. So we take the agreement as a whole. One, it makes sense in the context of the parties and this utilitarian standpoint we're supposed to interpret it from. But it also just clearly says, this is how you exercise those rights. And because, you know, and I think that was an error in... So your view is that Clause 6 isn't some kind of independent grant. It's part and parcel of the whole agreement that if the default occurs and they exercise the option to take this property, that's what they can do with it. Correct. And I think that's clear if you look at a sign and at the case law from this court. They didn't have Title II assigned to anyone. So I think by its own definition and the rights as they were construed and given here, and as everyone agrees that Intellectual Tech still has title to the patent, Main Street couldn't exercise these rights as Main Street. They had to use this power of attorney. And then they're really just stepping into the shoes of Adam Krasno, not Intellectual Tech, as he's the sole member of the LLC. So they step into his shoes and then they can take certain actions in case he wasn't fulfilling their obligations. But here we know they didn't. And I think you're right, Judge, he's about this being a defense, getting a license. And we know they keep saying about the right to get a license, but we know that that is, as in most of these cases, completely illusory. They know who Main Street is. They've opposed them multiple times in this case. They took discovery. They never got a license. And so they're asking you to construe this agreement solely to the benefit of Zebra, who's a non-party to the agreement, to the detriment of Main Street, who bargained for this flexibility to have these options to continue to enforce this to recover their investment. Unless the court has any other questions, I'll concede the rest of my time. Thank you. Thank you. Thank you. Thank both sides and the cases submitted.